TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1ˢᵗ Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (862) 397-5690

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

January 10, 2020

Michael J. Donnelly, Esq.
Lasser Hochman, L.L.C.
75 Eisenhower Parkway, Suite 120
Roseland, New Jersey 07068-1694

Fred Semrau, Esq.
Robert Rossmeissl, Esq.
Dorsey & Semrau, LLC
714 Main Street
P.O. Box 228
Boonton, New Jersey 07005

     Re:    <u>Braemar at West Milford, LLC v. West Milford Township</u>
               Docket Nos. 012238-2010, 011850-2011, 010904-2012,
               014484-2013, 011227-2014, 008652-2015, and 008236-2016

Dear Mr. Donnelly, Mr. Semrau and Mr. Rossmeissl:

This constitutes the court's opinion with respect to West Milford Township's ("West Milford") motions for reconsideration of the court's September 20, 2019 letter opinion following trial in the above matters ("motions for reconsideration"). Specifically, West Milford seeks reconsideration of that limited portion of the court's opinion finding the highest and best use of Lots 14, 20, and 23 on the subject property were as three single-family home lots, as of the October 1, 2011 and October 1, 2012 valuation dates.[1]

For the reasons set forth below, West Milford's motions for reconsideration are denied.

---

[1] West Milford's motions for reconsideration do not challenge the court's highest and best use and value conclusions for Lot 19.

1

## I. Findings of Fact & Procedural History

Braemar at West Milford, LLC ("Braemar"), was the owner of a tract of real property located along Wooley Road in West Milford, New Jersey. As of the valuation dates at issue, the real property consisted of four contiguous lots containing a total of 76.63 acres. The property was identified on West Milford's municipal tax map as Block 10001, Lots 14, 19, 20, and 23 (the "subject property").

On or about June 25, 2003, Braemar's predecessor in interest received preliminary major subdivision approval from the West Milford Planning Board (the "Planning Board") for construction of a seventeen lot single-family subdivision development on the subject property. However, as a result of several issues, including without limitation, Braemar's inability to furnish well water tests satisfying the requirements of West Milford's Water Supply and Water Quality Requirement Ordinance No. 2007-028 (the "Water Supply Ordinance"), final major subdivision approval for what ultimately became a twelve lot single-family subdivision development was not granted until approximately a decade later, on December 17, 2015.

Braemar filed complaints challenging the subject property's 2010, 2011, 2012, 2013, 2014, 2015 and 2016 tax years local property assessments, as being in excess of its true value.

During trial, Braemar offered testimony from its principal, its land use attorney, and a State of New Jersey certified general real estate appraiser (the "Expert"). The Expert prepared an appraisal report expressing his opinion of the market value of the subject property as of the October 1, 2009, October 1, 2010, October 1, 2011, October 1, 2012, October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates. In the Expert's opinion, final major subdivision development approvals were not reasonably probable as of each valuation date. Therefore, he opined that the subject property should be valued as four individual lots having a highest and best use as follows:

2

(a) Lot 19, as improved with a single-family home; (b) Lot 14, as a single-family home building lot; (c) Lot 20, for completion of the single-family model home partially constructed on the lot; and (d) Lot 23, as a single-family home building lot.

In response, West Milford offered testimony from its municipal tax assessor and from its Planning Board attorney. West Milford offered no expert valuation evidence or testimony.

Following six days of trial, on September 20, 2019 the court issued a letter opinion: (i) reducing the 2009, 2010, 2011, 2012, 2013, 2014, 2015 and 2016 years local property tax assessments on Lot 19; (ii) affirming the 2011 year local property tax assessment on Lots 14, 20, and 23; and (iii) reducing the 2009, 2010, 2012, 2013, 2014, 2015 and 2016 years local property tax assessments on Lots 14, 20, and 23.[2]

Without restating in its entirety the substance of the court's September 20, 2019 opinion, the court methodically detailed the chronology of events and analyzed and evaluated the testimony and evidence offered during trial. After considering all of the foregoing, the court concluded that, as of the October 1, 2011 and October 1, 2012 valuation dates, "developing the subject property into seventeen single-family home building lots appeared improbable and more problematic." September 20, 2019 letter opinion, at 25. The court found the Expert's highest and best use opinions for the subject property, as of the October 1, 2011 and October 1, 2012 valuation dates, to be reasonable and credible, concluding that the most objective probable use of the subject

_____

[2] In accordance with R. 8:9-3, the court afforded the parties until October 18, 2019 to submit their proposed computations of the local property tax assessments in accordance with the court's opinion. On November 12, 2019, West Milford filed a letter setting forth the parties agreement regarding the allocation of the local property tax assessments for Lots 14, 19, 20 and 23, for all tax years at issue. Accordingly, on November 19, 2019, the court entered Judgments for all tax years at issue in these matters.

property's land, as gauged in the marketplace and specific to the user and to the timing of the use, was as a residential development consisting of four single-family home lots.

However, the court rejected the Expert's highest and best use conclusions for the subject property for the 2010, 2011, 2014, 2015, and 2016 tax years. Specifically, the court explained that it did not find credible the Expert's conclusion that final major subdivision approval for a seventeen lot single-family subdivision development was "speculative" as of each valuation date at issue. After analyzing and evaluating the objective facts and data adduced in the trial record by these criteria, the court concluded that the highest and best use of the subject property was: (i) Lot 19, as improved with a single-family home, as of the October 1, 2009, October 1, 2010, October 1, 2011, October 1, 2012, October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates; and (ii) Lots 14, 20, and 23, as a proposed sixteen single-family home subdivision (seventeen lots less Lot 19), as of the October 1, 2009 and October 1, 2010 valuation dates; (iii) Lots 14, 20, and 23, as three single-family home building lots as of the October 1, 2011 and October 1, 2012 valuation dates (four lots less Lot 19); (iv) Lots 14, 20, and 23, as a proposed sixteen single-family home subdivision as of the October 1, 2013 and October 1, 2014 valuation dates (seventeen lots less Lot 19); (v) Lots 14, 20, and 23, as a proposed eleven single-family home subdivision as of the October 1, 2015 valuation date (twelve lots less Lot 19).

The court then analyzed the sales data and adjustments applied by the Expert to discern an estimate of value for the subject property. For the reasons set forth in the court's September 20, 2019 letter opinion, the court rejected several sales transactions identified by the Expert as comparable to the subject property and accepted others. Additionally, the court rejected several adjustments applied by the Expert for the reasons more particularly set forth in the court's September 20, 2019 letter opinion. After explaining its rationale for rejecting certain sales

4

transactions and adjustments, the court compared and analyzed the remaining sales and adjustments applied by the Expert. From the remaining data, the court discerned an estimate of true value for the subject property and applied said value as of each valuation date at issue.

West Milford subsequently filed motions for reconsideration of the court's September 20, 2019 opinion. Specifically, West Milford seeks reconsideration of that limited portion of the court's opinion finding that the highest and best use of Lots 14, 20 and 23 on the subject property was as three single-family home lots as of the October 1, 2011 and October 1, 2012 valuation dates.[3]

In support of its motions, West Milford presents three arguments: (i) the court's highest and best use conclusion for Lots 14, 20 and 23, as of the October 1, 2011 and October 1, 2012 valuation dates, was "reached upon an incorrect basis, and that the court failed to appreciate the significance of probative, competent evidence in the record"; (ii) "in spite of the [New Jersey Department of Environmental Protection's June 27, 2011] letter's [express] words: 1) the project continued to be exempt, and 2) Braemar had reason to believe the project continued to be exempt"[4]; and (iii) "even assuming the Highlands Act [N.J.S.A. 13:20-1 to -35] exemption had lapsed, the court was erroneous in its conclusion of value for the subject property as of the October 1, 2011 and October 1, 2012 valuation dates."

---

[3] West Milford submitted reply papers on January 8, 2020, two days prior to the return date of the motions and outside the time period permitted under R. 1:6-3(a). Despite such deviation, the court accepted the reply papers under R. 1:1-2.

[4] In its reply papers, West Milford submits that it is the "perception in the marketplace that a protected right has been conferred on the property" and not Braemar's subjective belief that the project continued to be exempt that is paramount. However, as evidence of the alleged perception in the marketplace West Milford highlights only arguments advanced in August 2011 by one of Braemar's attorneys as to why the Planning Board should consider Braemar's application for final major subdivision approval, and not any expert valuation testimony as to the marketplace's reaction to the presence or lack of final approvals.

## II. Conclusions of Law

### A. Standard for Reconsideration

A motion for rehearing or reconsideration is governed by R. 4:49-2. See also R. 8:10. The rule provides, in part, that:

> [A] motion for rehearing or reconsideration seeking to alter or amend a judgment or order . . . shall state with specificity the basis on which it is made, including a statement of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred, . . . .
>
> [R. 4:49-2.]

Thus, a motion for reconsideration must be supported by "a statement 'of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred.' The basis to such a motion, thus, focuses upon what was before the court in the first instance." Lahue v. Pio Costa, 263 N.J. Super. 575, 598 (App. Div. 1993) (internal citations omitted).

A motion for rehearing or reconsideration is sparingly granted. Nonetheless, reconsideration "is a matter within the sound discretion of the Court, to be exercised in the interest of justice." Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996). However, reconsideration should not be used simply as a vehicle to reiterate the merits of a legal position. Capital Fin. Co. of Delaware Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div.), certif. denied, 195 N.J. 521 (2008). A motion for reconsideration should be granted "only for those cases which fall into that narrow corridor in which either: (1) the court has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the court either did not consider, or failed to appreciate the significance of probative, competent evidence. . . ." D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990); see also Fusco v. Bd. of Educ. of the City of Newark, 349 N.J. Super. 455, 462 (App. Div.), certif. denied, 174 N.J. 544 (2002). A motion for

6

reconsideration is not fitting because a litigant has expressed dissatisfaction with the court's decision, the appropriate setting for such arguments are on appeal. D'Atria, 242 N.J. Super. at 401.

B. Discussion

1. The court's highest and best use conclusion for Lots 14, 20, and 23, as of the October 1, 2011 and October 1, 2012 valuation dates, was supported by the record and the evidence offered during trial.

In its motions for reconsideration, West Milford argues that the court's highest and best use conclusion for Lots 14, 20 and 23, as of the October 1, 2011 and October 1, 2012 valuation dates, was "reached upon an incorrect basis, and that the court failed to appreciate the significance of probative, competent evidence in the record." In support of this contention, West Milford submits that despite the New Jersey Department of Environmental Protection's June 27, 2011 letter stating that "the [Highlands Applicability Determination] issued on December 20, 2004, has also expired and the project is no longer exempt," Braemar nevertheless commenced litigation against West Milford and the Planning Board in December 2011. West Milford contends that Braemar's commencement of this litigation demonstrates that "Braemar did not believe that 'it could not have built the seventeen lot subdivision under the terms of the Highland's Act.'"

West Milford's argument is without merit. "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use analysis requires objective consideration of "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value." The Dictionary of Real Estate Appraisal, at 93. The highest and best use analysis requires an appraiser to "interpret[] the market forces that affect the subject property and identif[y] the use or uses on

7

which the final opinion of value is based." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013). Thus, a property's highest and best use is "shaped by the competitive forces within the market where the property is located." Id. at 331. Significantly, a property's highest and best use is:

> not a function of a particular owner's use or subjective judgment as to how a property should be used. . . . Highest and best use is not determined through subjective analysis by the property owner. The proper determination of highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses. Additionally, the proposed use must not be remote, speculative, or conjectural. If a party seeks to demonstrate that a property's highest and best use is other than its current use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence.
>
> [Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 268-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015) (internal citations omitted).]

Thus, whether Braemar subjectively believed, or did not believe, that it could build a seventeen lot single-family home subdivision on the subject property as of the October 1, 2011 and October 1, 2012 valuation dates is not conclusive evidence of the subject property's highest and best use on those dates. That is not to say that information, facts, and data about a property should be ignored when performing a highest and best use analysis. Rather, in performing a highest and best use analysis, an appraiser must attempt to solicit all available information about the property, including any physical and/or legal issues that impact or affect it. In performing the highest and best use analysis, the appraiser may give consideration to: (i) whether the existing improvements on the property should be maintained in their current state; (ii) whether the market value of the property with the existing improvements is greater than the market value of the land as vacant, less the cost to demolish the existing improvements; and (iii) what are the potential alternative uses of the property. However, in order to meaningfully weigh each of these

8

considerations, the appraiser must have examined and analyzed supply and demand data from the marketplace, including timing, zoning trends, price, private restrictions, building codes, ordinances, environmental restrictions, etc. Only after detailed information about the property being appraised has been gathered and the appraiser has objectively analyzed and reviewed the market data collected, can the appraiser reach an informed decision of what uses are physically possible, appropriately supported, financially feasible, and that will result in the highest value of the property.

Thus, here, the Expert was required to evaluate in an objective manner the economic conditions, demand in the marketplace, and the facts and information known about the subject property, including without limitation, the reasonable probability of satisfying the preliminary major subdivision approval conditions, to discern its highest and best use.

The testimony and evidence introduced during trial disclosed the following material facts: (i) in 2003 the subject property received preliminary major subdivision approval for a seventeen lot single-family home subdivision development; (ii) on December 20, 2004, the New Jersey Department of Environmental Protection ("NJDEP") granted the project an "exempt[ion] from the provisions of the Highlands Water Protection and Planning Act"; (iii) in or about late 2006, Braemar made application for: (a) final major subdivision approval; (b) construction permits to build a single-family home on Lot 19, and to build a single-family model home on one of the proposed interior building lots; and (c) commenced construction of the two single-family homes; (iv) on November 7, 2007, West Milford adopted the Water Supply Ordinance; (v) in late 2007, the well-documented economic downturn began, resulting in a dramatic slowing of Braemar's efforts to perfect final major subdivision approval; (vi) between 2007 and 2011, communications between Braemar, the Planning Board and their representatives were exchanged regarding the

9

subject property's aquifer test, aquifer test plan addendum, available groundwater on the subject property, and Braemar's willingness to comply with the Water Supply Ordinance; (vii) on June 27, 2011, the NJDEP issued a letter advising that "the Freshwater Wetlands general permit [for the subject property] has expired [and] the [Highlands Applicability Determination] issued on December 20, 2004, has also expired and the project is no longer exempt"; (viii) in 2011, following receipt of the NJDEP's letter, the Planning Board conducted a completeness hearing resulting in the termination of review of Braemar's application for final major subdivision approval, finding that the application was incomplete as a result of its noncompliance with the Water Supply Ordinance and lack of a valid Highland's Act exemption; (ix) on December 12, 2011, Braemar commenced litigation against West Milford and the Planning Board seeking declaratory judgment that approval of its application for final major subdivision approval does not require compliance with the Water Supply Ordinance, and a writ of mandamus compelling the Planning Board to consider its application for final major subdivision approval; (x) on September 24, 2012, Braemar, West Milford, and the Planning Board entered into a Settlement Agreement and Consent Order (the "Settlement Agreement") of the litigation; (xi) under the terms of the Settlement Agreement: (a) the Planning Board agreed to reinstate Braemar's application for final major subdivision approval; (b) Braemar agreed to comply with the Water Supply Ordinance and (c) the Planning Board agreed to grant a conditional approval of Braemar's final major subdivision application subject to: (i) compliance with the Water Supply Ordinance; and (ii) Braemar submitting satisfactory evidence that the December 20, 2004 Highland's Act exemption letter remains effective or has been reinstated by the NJDEP; (xii) on December 20, 2012, the NJDEP issued a letter reversing its prior finding and concluding that, based on its review of additional information submitted, "the work conducted under the Freshwater Wetlands General Permits . . . was

10

completed prior to both permit expiration dates, and that the local approval remains valid." Thus, "the Exempt – Consistent finding from [the] December 20, 2004 [exemption letter] remains valid"; (xiii) on December 17, 2015, the Planning Board conditionally approved Braemar's revised application for final major subdivision for twelve single-family lots.

In its reply papers, West Milford relies on Rockstone Group v. Lakewood Twp., 18 N.J. Tax 117 (Tax 1999), for the proposition that "MUA, DEP and DOT requirements are conditions precedent to obtaining building permits, not to obtaining municipal approvals." Id. at 124. Thus, West Milford submits that it is the "perception in the marketplace that a protected right has been conferred on the property" that is most important. However, a closer reading of Judge Axelrad's opinion Rockstone Group reveals that what was "[o]f most relevance" in determining whether there was a substantial and meaningful increase in property value under the Freeze Act, N.J.S.A. 54:51A-8, was the "property rights that the Legislature conferred upon the developer [under the Municipal Land Use Act, N.J.S.A. 40:55D-50(a)] upon final approval of a site plan." Rockstone Group, 18 N.J. Tax at 124 (emphasis added). Here, final major subdivision approval for twelve single-family home lots was not granted until December 17, 2015, three to four years after the October 1, 2011 and October 1, 2012 valuation dates at issue. Significantly, West Milford elected to offer no expert valuation testimony with respect the marketplace's reaction or perception that a protected right was conferred on the property, if any.

Conversely, as expressed by the court in the September 20, 2019 letter opinion, during trial Braemar's Expert presented credible testimony and evidence with respect to his examination and analysis of supply and demand data in the marketplace, including but not limited to use, zoning, price, ordinances, and environmental restrictions.

After evaluating and analyzing all of the testimony, the court determined that the Expert's highest and best use conclusions for the subject property, as of the October 1, 2011 and October 1, 2012 valuation dates, that final major subdivision approval was "speculative," and that "the property did not have development potential beyond four lots," was both objectively reasonable based on his analysis of the marketplace and was supported by the empirical evidence. In sum, the court concluded that the highest and best use of the subject property's Lots 14, 20, and 23, as of the October 1, 2011 and October 1, 2012 valuation dates, was as three single-family home lots and did not fail to appreciate the significance of any probative, competent evidence in the record.

2. The subject property's Highland's Act exemption was revoked by the NJDEP, but was later reinstated.

West Milford now argues that the NJDEP's June 27, 2011 letter was an "erroneous determination" and that the court "must consider how the June 27, 2011 letter from the NJDEP came into existence," and that "Braemar itself might be culpable" for why the NJDEP arrived at its determination.

Contrary to West Milford's assertions, the court considered both the origins of the NJDEP's June 27, 2011 letter and how that letter impacted the probability of obtaining final major subdivision approval. Moreover, despite West Milford's acknowledgement in its motions for reconsideration that the NJDEP's June 27, 2011 letter was "erroneous," credible testimony was presented by Braemar's land use attorney, Mr. Loveys, and West Milford's Planning Board attorney, Thomas Germinario, that the NJDEP's June 27, 2011 letter unequivocally stated that "the Freshwater Wetlands general permit has expired [and] the [Highlands Applicability Determination] issued on December 20, 2004, has also expired and the project is no longer exempt." (emphasis added.)

The record further disclosed that although Braemar disagreed with the conclusions reached by the NJDEP in the June 27, 2011 letter and began pursuing an administrative appeal, it was not an absolute certainty that its efforts to challenge the NJDEP's determination would prove successful. To the contrary, Mr. Loveys readily acknowledged that should Braemar's efforts have proven unsuccessful, "the ramifications of [the loss of the Highland's Act exemption], it was very serious . . . ," without the Highland's Act exemption, Braemar "could not have built the seventeen lot subdivision. . . ."

Moreover, the trial record failed to demonstrate that when the NJDEP issued its June 27, 2011 letter that the Planning Board agreed with characterizing it as "erroneous." Rather, testimony was elicited during trial that the NJDEP's June 27, 2011 letter directly impacted how the Planning Board viewed Braemar's application for final major subdivision approval.

According to Mr. Germinario, he "requested that [NJDEP] make a determination on that issue, whether or not the exemption was still good, because we needed to know that. We [the Planning Board] couldn't create lots with the uncertainty as to whether [Braemar] still retained the [Highland's Act] exemption." Mr. Germinario further expressed that if it was determined after final major subdivision approval was granted and the plat filed that "the [Highland's Act] exemption was terminated we would have lots that could have no water supply . . . Then we would have created lots that were undevelopable." In Mr. Germinario's opinion, as the Planning Board's counsel, he bore an obligation to "make a determination that [Braemar] still had their Highland's Exemption status because I [Mr. Germinario] was aware that that provision in the Highlands Regulation said that you could not have a cessation or lapse of construction of . . . over one year."

Mr. Germinario's rationale for requesting clarification from the NJDEP regarding the status of Braemar's Highlands Act exemption is not unreasonable in light of the time period that

13

elapsed from the date preliminary major subdivision approval was granted. This was further reinforced by Mr. Germinario's testimony that if an applicant in West Milford sought subdivision approval without having received a Highland's Act exemption from the NJDEP there "would be no way for them to get approval of water or septic . . . if they tried to create lots. . . ."

However, notwithstanding Mr. Germinario's reasoning for soliciting the NJDEP's opinion, following receipt of the NJDEP's June 27, 2011 letter, the Planning Board conducted a completeness hearing. Pursuant to Mr. Germinario's testimony,

> we were unable to get any firm determination of when the exemption issue would be clarified . . . So rather than . . . continuing [our] obligation to make completeness determinations and these things keep coming back up on our agenda . . . we just ruled that we would terminate the review until they . . . were in a position to comply with both the aquifer testing and the Highlands Exemption requirements.

Therefore, according to Mr. Germinario, the Planning Board terminated review of Braemar's application for final major subdivision approval, permitting it "to reapply for final major subdivision approval when, and if, they have a valid Highlands Exemption and/or approval and when they are prepared to complete the aquifer testing required by ordinance . . . ." (emphasis added.)

Additionally, although Braemar commenced litigation in December 2011 against West Milford and the Planning Board seeking review of its final major subdivision application, the commencement of such litigation did not amount to an acknowledgement by Braemar that a seventeen lot single-family home subdivision remained possible. In fact, under paragraph 7 of the Settlement Agreement, the parties expressly recognized that the Planning Board "determined that [Braemar's] Final Major Subdivision Application was incomplete due to noncompliance with [the Water Supply Ordinance] and because [Braemar] lacked a currently valid Highlands Exemption . . . , requiring [Braemar] to file a new final major subdivision application should they be in a

14

position to fulfill the aforesaid completeness requirements in the future. . . ." (emphasis added). Significantly, the Settlement Agreement did not say that the Planning Board will consider the application when Braemar's Highlands Act exemption is reinstated. Rather, the Settlement Agreement stated that it will consider Braemar's application should the Highlands Act exemption be reinstated, thereby contemplating that Braemar may never be in a position to fulfill that conditions of the settlement. (emphasis added.)

Additionally, the Settlement Agreement expressly conditioned the Planning Board's grant of conditional approval of Braemar's application for final major subdivision approval on Braemar submitting "evidence to the reasonable satisfaction of the [Planning] Board . . . that the Highlands Applicability Determination granting the Highlands Exemption, which was issued to [Braemar] on or about December 20, 2004, remains effective or has been re-issued or re-instated." Thus, Braemar, West Milford, and the Planning Board observed, as of September 24, 2012, that receipt of reinstatement of the Highlands Act exemption was not a foregone conclusion, but rather was an uncertain, but necessary, condition precedent to the grant of conditional approval of Braemar's application for final major subdivision approval.

Therefore, for the foregoing reasons, the court rejects West Milford's argument that the Highlands Act exemption for the subject property was actually never revoked by the NJDEP and that Braemar understood that the Highlands Act exemption was never actually revoked.

3. The court did not reach an erroneous conclusion of value for the subject property as of the October 1, 2011 and October 1, 2012 valuation dates.

West Milford argues that the court's September 20, 2019 letter opinion unjustly enriches Braemar because the court "valued Lots 14, 20[,] and 23 of the subject property upon an incorrect basis as of these dates, and failed to appreciate the significance of probative, competent evidence."

15

Additionally, West Milford contends that the court's decision deprived West Milford's tax assessor of the right to "appropriately capture the value of the subject property" as an omitted assessment. Because, "[h]ad Defendant's Township's Assessor known during the span of the appeal that the Subject Property's Highlands Act exemption was lost effective as of the NJDEP's letter of June 27, 2011, and that said exemption as restored as of the NJDEP's letter of December 20, 2012, then the Assessor would have had the opportunity . . . to enact an Omitted Assessment after the October 1, 2012 valuation date. . . ."

West Milford's argument is without support. First, during trial, West Milford elected not to present any evidence to the court from a valuation expert regarding the subject property's highest and best use, or its true value. Therefore, based on the evidence and testimony adduced during trial, the court concluded that the Expert's highest and best use conclusions, as of the October 1, 2011 and October 1, 2012 valuation dates, were reasonable and supported by the evidence, finding that the highest and best use of Lots 14, 20, and 23 on the subject property, as of those dates, was as three single-family home lots.

Accordingly, in attempting to discern the true value of the subject property as of the October 1, 2011 and October 1, 2012 valuation dates, the court evaluated and analyzed the comparable sales evidence presented by the Expert. Giving due consideration to that price which a hypothetical buyer would pay a hypothetical seller, as of October 1st of the pretax year, neither of which were constrained to purchase or sell the property, the court concluded, for the reasons expressed in the September 20, 2019 letter opinion, that the true or fair market value of Lots 14, 20, and 23 was $275,000.

A solemn principle is set forth under the Uniformity Clause of our state's Constitution, requiring an equality of treatment and of burden in setting property tax assessments. N.J. Const.

art. VIII, § 1, ¶ 1(a); see also West Milford Twp. v. Van Decker, 120 N.J. 354, 360-61 (1990); Baldwin Construction Co. v. Essex County Board of Taxation, 16 N.J. 329 (1954). "Consistent with the command of the Uniformity Clause [is] that all property in a taxing district be assessed at the same standard of value, [and] assessors are obligated by statute to make an annual assessment of each parcel of real property in a taxing district at its full and fair value." Chadwick 99 Associates v. Dir., Div. of Taxation, 23 N.J. Tax 390, 412-413 (Tax 2007). That rule is memorialized under N.J.S.A. 54:4-23, requiring tax assessors to "determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments . . . ." N.J.S.A. 54:4-23.

As expressed by our Supreme Court, in attempting to discern a property's true value for tax purposes "[t]he search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller." New Brunswick v. State Div. of Tax Appeals, 39 N.J. at 537, 544 (1963). This concept is often referred to as value in exchange or the "value, in terms of cash, of a property which is bartered for another asset or assets, cash being the yardstick by which the comparative value of each can be assessed." Appraisal Institute, The Dictionary of Real Estate Appraisal, 260 (5th ed. 2010).

However, in order to derive a property's estimated value in exchange, as of October 1st of the pretax year, a thorough examination is required of the "particular facts [about a property] and the reaction to them of experts steeped in the history and hopes of the area." New Brunswick, 39 N.J. at 544. See also Petrizzo v. Edgewater Borough, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). Thus, in order to discern the value of Lots 14, 20, and 23 on the subject property, as of the October 1, 2011 and October 1, 2012

17

valuation dates, the court was required to not only objectively weigh and consider the facts and information available, including without limitation, the status of the subject property's Highland's Act exemption, but to consider the marketplace's anticipated reaction to those facts and information, in terms of a value in exchange transaction, based on the testimony and evidence offered during trial.

Here, the court considered all of the factual and valuation evidence, thoughtfully and carefully analyzed the Expert's opinions, including the basis for such opinions, and rendered an opinion based on the credible evidence presented. Therefore, the court rejects West Milford's assertion that the court failed to appreciate the significance of probative and competent evidence in these matters and unjustly enriched Braemar.

Finally, West Milford hypothesizes that had its assessor known that the subject property's Highland's Act exemption was lost as a result of the NJDEP's June 27, 2011 letter, its assessor could have valued the subject property differently and then "would have had the opportunity after the October 1, 2012 valuation date to enact an Omitted Assessment once the Assessor had received notice of the NJDEP's letter of December 20, 2012." However, West Milford's argument is contrary to the law and amounts to little more than unfounded hypotheses, speculation, and conjecture.

It is the well settled law in this state that "real property must be valued in accordance with events known or reasonably foreseeable on the assessing date and without the benefit of hindsight." 200 43rd Street, L.L.C. v. Union City, 16 N.J. Tax 138, 141 (Tax 1996). See also Lamm Assocs. v. Borough of West Caldwell, 1 N.J. Tax 373, 385 (Tax 1980) (concluding that "[t]he more desirable approach is to conclude a value based on facts known or reasonably foreseeable as of the assessment date with subsequent events deemed relevant only if they are corroborative or

18

consistent with the reasoning and approach utilized."); Borough of Fort Lee v. Invesco Holding Corp., 3 N.J. Tax 332, 343 (Tax 1981) (concluding that "it is still the duty of the court to find the true value on what was known or reasonably foreseeable" as of the valuation date.), aff'd in part, rev'd in part, and remanded, 6 N.J. Tax 255 (App. Div.), cert. denied, 94 N.J. 606 (1983); Inwood at Great Notch v. Little Falls, 6 N.J. Tax 316, 332-333 (Tax 1984) (concluding that "[p]ost-assessing date events are not probative of true value unless they corroborate facts in existence on the assessing date or unless such events are reasonably foreseeable on the assessing date.")

Additionally, the record before the court failed to disclose that West Milford's tax assessor undertook any action in response to the NJDEP's June 27, 2011 letter advising that "the [Highlands Applicability Determination] issued on December 20, 2004, has also expired and the project is no longer exempt," to alter or modify the subject property's 2012 or 2013 tax year assessments. The hypothetical arguments that West Milford now raises in its motions for reconsideration are simply not the facts of the case.

Here, the court evaluated and considered the facts and evidence known and which were reasonably foreseeable about the condition and limitations of the subject property as of the October 1, 2011 and October 1, 2012 valuation dates. The court observed that although preliminary major subdivision approval was granted in 2003 for a seventeen lot single-family subdivision development, the grant of final major subdivision approval was not inevitable. Rather, the road to achieve final major subdivision approval was highlighted by a series of economic, physical and legal setbacks, including without limitation the NJDEP's June 27, 2011 letter advising that "the project is no longer exempt" under the Highland's Act. Thus, due to the uncertainty facing Braemar's efforts to obtain final major subdivision approval the court concluded that, as of the

19

October 1, 2011 and October 1, 2012 valuation dates, the highest and best use of Lots 14, 20, and 23 were as three single-family home building lots and should be valued accordingly.

### III. Conclusion

For the above stated reasons, the court denies West Milford's motions for reconsideration of the court's September 20, 2019r opinion following trial in the above matters.

An Order reflecting this opinion will be simultaneously entered herewith.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.